[No. 7842]

GRIMES ET AL. ADMINISTRATORS, v. BARNDOLLAR.

1. EVIDENCE. *Competency.* Evidence relevant to any phase of the issues, is admissible. (424)

2. GIFT INTER VIVOS. *Of Corporate Stock,* does not require endorsement of the certificate in order to its validity. (429)

3. ——*Evidence. Oral declarations, e. g.* "I have given all my stocks," to a party named, justifies the conclusion that the donee is entitled to all corporate stocks owned by the donor at the time of the declaration. (430)

4. ADMINISTRATOR. *Liability.* Corporate stocks were delivered, under protest, to administrators, by one in possession of, and claiming them by gift of the decedent, and were by them inventoried, and a

portion thereof afterwards sold under order of the County Court. The administrators acted throughout in good faith, under the advice of the County Judge, and with- the knowledge of plaintiff. They made no personal gain in the transaction. *Held* they were not personally liable for the value. (430)

5. INTERVENTION. *Effect—Pleading Thereto.* Action against administrators, personally, for the value of certain corporate stock. They intervened in their representative capacity. The heirs also intervened, praying that the stock be decreed to them. *Held* that plaintiff was entitled to answer the intervention petitions precisely as if the same matter had been presented in an original complaint, even although this presented equitable questions; that this was expressly allowed by Sec. 23 of the Revised Code; and that the action should proceed to a final decree upon the issues made by the petitions, and plaintiff's cross-complaint thereto. (437, 438)

6. SPECIFIC PERFORMANCE. *Contract—Certainty — Consideration.* The plaintiff claiming certain corporate stocks against the heirs and personal representatives of one Hall, relied upon a clause in an agreement between the heirs of Hall, which provided among other things that "the stocks and shares inventoried as belonging" to plaintiff, "shall be considered her property, and the certificate shall be delivered to her." Considering that the shares in question had at the decease of Hall been in possession of plaintiff, and had been by her delivered to the administrators, on their demand, but under protest and without waiver of any right, and had been inventoried with a statement of her claim and protest; that the agreement in question had for its purpose the adjustment of an action then pending between the heirs, involving the whole estate; that it resulted in the settlement of that controversy, and the disposition of the entire estate except the shares in question; that the heirs were represented by counsel who it was reasonable to assume were fully informed as to the details of plaintiff's claim; and that there were no other stock in dispute, it was *held* that the agreement was not objectionable for uncertainty, and that the mutual covenants of the heirs was a sufficient consideration, moving to each. (433, 435)

7. ——*Contract Between Third Persons.* In the same case. *Held* that the circumstance that plaintiff was not a party to the agreement upon which she relied was no obstacle to its specific performance on her behalf. (436)

8. ESTOPPEL. *By Conduct.* An action asserting title to the entire estate of a deceased person does not estop the plaintiff from afterwards asserting a just claim to a portion thereof. (439)

9. DAMAGES. *Conversion of Corporate Stock—Of what Date to be Valued.* Administrators had demanded corporate stock from one who was entitled thereto by gift of their intestate. She delivered them under protest, and the administrators received the same in their representative capacity and disposed of a portion thereof, applying the proceeds to the purposes of the estate. *Held* that the stock should be valued as of the date of the administrators refusal to surrender them on plaintiff's demand, with an addition for any dividends paid thereon, after the date of a certain agreement by which plaintiff's right to the stock was conceded by the heirs, and the date of her demand therefor, with interest upon the entire amount from the date of the demand. (441)

10. TROVER. *Date of Conversion.* Corporate stocks held converted at the date when demand of one entitled to immediate possession is refused. (442)

11. MANDATE. *Containing erroneous directions,* recalled upon petition filed at the same term, specifying the error. (443)

*Error to El Paso District Court.*—Hon. JAMES OWEN, Judge.

Mr. CHARLES S. THOMAS, Mr. WILLIAM H. BRYANT, Mr. GEORGE L. NYE, Mr. WILLIAM MALBURN, for plaintiffs in error.

Mr. SAMUEL H. KINSLEY and Mr. JOHN A. CARRUTHERS, for defendant in error.

Mr. JUSTICE HILL delivered the opinion of the court:

The basis of this contention is the ownership of stocks in sundry mining companies, which stood upon the books of the companies in the name of Harry Hall, at the time of his death. Trial was to the court, which found that Hall gave, transferred and delivered to the plaintiff (the defendant in error here) all stocks described in her complaint, the certificates for which had been endorsed by him; that the transaction constituted a gift *inter vivos,* but found against her as to the stocks,

the certificates for which had not been endorsed. The court also found, that a portion of an agreement in writing between the other claimants to the Hall estate, which, it is alleged, provides that the plaintiff should have all of these stocks, was not capable of specific enforcement, because too ambiguous and uncertain. The defendants and intervenors bring the case here. The plaintiff has assigned cross errors upon the theory that she was entitled to all the stocks under her claim of a gift *inter vivos:* also by virtue of the agreement between the other parties interested. Many errors are assigned. As the trial was to the court, those made by the defendants pertaining to evidence are not sufficient to justify a reversal. Its substance is material and responsive to some phase of the various contentions put in issue by the pleadings.

The main issue made by the first pleading is, who was the owner of these stocks at the time of Mr. Hall's death, which occurred very suddenly on January 29, 1909. The record discloses, that for about fourteen years prior thereto, the plaintiff Minnie Barndollar, lived at his residence and acted as housekeeper (she was probably there prior to the death of Mrs. Hall, which occurred in 1896); that Hall left an estate valued at about $170,000 of which $117,000 was in real estate; that in the fall of 1903 Hall and Miss Barndollar were starting on a strip to California when she placed, what purported to be, certain stocks in charge of Mr. and Mrs. Jones, then residing in the house with them; that the stocks were in a tin box, the contents of which the Joneses did not see, but were informed by Miss Barndollar, in the presence of Hall, that the box contained stocks belonging to her and that in case of fire these stocks should be saved, as they were all she had; that Hall, while hearing it, did not dispute this assertion, but joined in the conversation, and among other things said 'Yes, for goodness sake save the stocks,

that they were hers and they were all she had'; that in May, 1905 when Hall was leaving for England he called the Joneses, who were still living in his house, to witness an agreement between Miss Barndollar and him, saying that he wanted to make this gift of stocks that Minnie held legal; that the stocks he was then giving her were valued at about $30,000; that during this conversation he presented a paper in his handwriting signed by himself and Miss Barndollar requesting the Joneses to witness it. It reads:

"COLORADO SPRINGS, COLO.,
May 1st, 1905.

This agreement entered into by H. Hall, of the 1st part and Minnie Barndollar, of the 2nd part, this 1st day of May, 1905, to-wit: The said Hall, in consideration of services rendered by Minnie Barndollar, has endorsed and left with Minnie Barndollar certain mining stock certificates, and in case of his death the said mining stock certificates are to become the property of Minnie Barndollar, and in the meantime if the stock should enhance in value, and she should decide that it would be advantageous to dispose of some of them, she is at liberty to do so, and the proceeds, in case of my death, are to belong to Minnie Barndollar, and that it is my desire that all courts of law and equity so construe the above that the same shall in no case for want of legal form or otherwise be construed as that my relatives or any other person should possess or enjoy the above except and in the manner and for the uses hereinabove specified without any mental reservation or purpose of evasion.

Witness our hand and seal this 1st day of May, 1905.
Witness
Rose Jones                                H. Hall, (Seal)
W. C. Jones                Minnie Barndollar   (Seal.)
          (Made in duplicate)"

Another instrument in the hand writing of Mr. Hall, dated June 6, 1908, signed by himself and Minnie Barndollar, is in the record; it reads:

"COLORADO SPRINGS, COLO.

This agreement entered into by H. Hall of the 1st part, and Minnie Barndollar of the 2nd part, this 6th day of June, 1908, to-wit: The said H. Hall in consideration of services rendered by Minnie Barndollar, has endorsed and left with Minnie Barndollar certain mining stock certificates, and in case of his death the said mining stock certificates are to become the property of Minnie Barndollar to do with as she thinks proper, and the proceeds, in case of my death, are to belong to Minnie Barndollar, and that it is my desire that all courts of law and equity so construe the above that the same shall in no case for want of legal form or otherwise, be so construed as that my relatives or any other person should or shall possess or enjoy the above, except and in the manner, and for the use hereinabove specified, without any mental reservation or purpose of evasion.

Witness our hand and seal this 6th day of June, 1908.

Witness

H. Hall (Seal.)

Minnie Barndollar (Seal.)"

Jones testified to a conversation with Hall about a week or ten days before his death, on the street, in which Mr. Hall said, "Do you know what I think I will do? * * * I believe I will put this lot in Miss Minnie's and Laura's name; * * * I believe you ought to look after your friends first, * * * You know I have given all my stocks to Miss Minnie;" that they then talked about what could be done on the other end of the lot in the way of cheap buildings for rent, etc. The witness further states, that the stocks were discussed a great deal by

Hall and Miss Barndollar; that he has heard Hall ask her to go up and get the stocks, and things like that, not once but a dozen times; that he had repeatedly seen them go over the stocks on the table, and discuss them in general conversation.

Mrs. Jones testified, that ostensibly Miss Barndollar occupied the relation of housekeeper, and was supposed to be paid for her services; that she did the washing and mending, tending to all those things. Witness further testified, that in the fall of 1907 she saw Miss Barndollar in the dining room in tears; that Hall asked the witness what the matter was; that she stated Miss Barndollar was dissatisfied with the arrangements about stocks; that it worried her; that the value of the stocks fluctuated, and inasmuch as he had this property in her name at one time, and it suits her better and satisfies her, why not do the same thing again; that he said she ought to be satisfied with them; that they would always represent about $30,000, and then if she did not have these stocks he had taken care of her in another way, which he did not tell the witness about; that later she told the plaintiff what he said.

Jones testified, that the first he saw of the stocks after Mr. Hall's death was the evening thereafter; that it was in the plaintiff's room at the Hall residence; that he went over the stocks to see what she had; that he next saw them after he and Mr. Grimes had been appointed administrators to collect, which was two or three days thereafter that the stocks were in a box which she brought down and unlocked; that they took them out of the box, making a list of them later that day; that all stocks referred to in the inventory as having been received from her were actually received from her, except 6,000 shares of Isabella, which Mr. Grimes testified were taken from the desk in the library or somewhere in the

house.  Jones says, that after their appointment, Miss
Barndollar was called upon to deliver the stocks; that
she did so under protest, claiming them as her property
by reason of the gift to her of them by Mr. Hall.  Mr.
Grimes testified, in substance, that after his first talk
with Miss Barndollar, he discussed the advisability of
taking the stocks, with the County Judge; that the judge
advised him that they should take the stocks, making
a record of any protest and claim Miss Barndollar might
make, inventory them, and that the matter of her owner-
ship would be settled afterwards; that after stating to
her what the judge had suggested, she delivered the
stocks to them under protest, claiming them as her prop-
erty; that it had been previously stated to her that they
would discuss the matter with the County Judge and get
his suggestion; that she said she did not think any ad-
vantage would be taken of her, only she wanted to save
whatever right she had; that if it was proper to turn
them over she would deliver them; that the subject of
turning them over had been discussed two or three times
before there was an actual delivery; that he told her that
they would list the stocks with the assets of the estate,
making a record in the inventory of her claim, protest,
etc., with the understanding that any right she might
have in the property would be protected, and would not
be lost by reason of their being inventoried in the assets
of the estate; that he thinks this was the County Judge's
suggestion; that a part of the stocks were endorsed and
a part were not; that she claimed all the stocks which
she delivered, and that she was not represented by an at-
torney prior to the delivery; that they listed the stocks
as a part of the assets of the estate, as being found and
taken from the possession of Minnie Barndollar, the
same being claimed by her as her property, etc.; that the
delivery was made by her to them under protest and
waiving no right by reason of said delivery.

Further analysis of the evidence is unnecessary. For reasons hereafter stated, we will not pass upon the findings of the court in this respect, other than to say that a careful examination of the record satisfies us that there was competent evidence to sustain the ruling of the trial court in finding that there had been a gift *inter vivos* of the stock endorsed, as well as evidence which might have been sufficient, had the court so found, to sustain a gift *inter vivos* of the unendorsed stock. There is no evidence which makes a distinction as to the intention of the donee pertaining to the two classes of stock, other than the instruments above quoted, and the fact that part was endorsed and the remainder unendorsed, while the undisputed oral evidence is to the effect that the deceased intended to, and did, make a gift of it all. In *Fagan v. Troutman,* 24 Colo. App. 473, 135 Pac. 122, the instrument in question was a certificate of deposit; at page 480 (135 Pac. 124) the court said:

"The weight of authority seems to establish the rule almost beyond controversy that the indorsement of an instrument of the character we are considering is not necessary as a matter of law to sustain a gift *inter vivos* or one *causa mortis.*"

This seems to be the generally accepted rule.—*Ridden v. Thrall,* 125 N. Y. 572, 26 N. E. 627, 11 L. B. A. 684, 21 Am. St. 758.

Counsel lay great stress upon the clause in the two instruments wherein they refer to endorsed stocks. They are but a part of the evidence upon the subject, and if thus intended at the time executed, there is evidence that the deceased had different understandings with the donee prior to his death. She was prohibited from testifying and the testimony pertaining thereto was limited to the statements of Mr. Hall, the actions of the parties and the instruments executed by him concerning

them, or a part of them. "All my stocks" are the words purported to have been used by him; "the stocks are hers" and similar expressions appear throughout the record, for which reasons, as stated, there is evidence, had the court so found, to justify a conclusion that the plaintiff was entitled to all the stocks under the theory of a gift *inter vivos*. Similar cases in some respects are: —*Fagan v. Troutman, supra; Gilkinson v. Third Ave. R. Co.,* 47 App. Div. 472, 63 N. Y. Supp. 792; *Roysson v. McCulley* (Tenn.) 59 S. W. 725, 52 L. R. A. 899; *Candee v. Connecticut Savings Bank,* 81 Conn. 372, 71 Atl. 551, 22 L. R. A. (N. S.) 568; *Garrison v. Union Trust Co.,* 164 Mich. 345, 129 N. W. 691, 32 L. R. A. (N. S.) 219; *Clinton v. McKeown,* 39 S. C. 21, 17 S. E. 504; *Tucker v. Tucker,* 138 Iowa, 344, 116 N. W. 119.

The judgment was against Jones and Grimes personally in damages for the conversion of the endorsed stock. It is urged, as they were acting in their official capacity, which fact was known to plaintiff, and as they received no personal benefit, but turned the stocks in as an asset of the estate, and as a part of it has since been sold by order of court as assets of the estate, that no judgment should have been rendered against them personally. We agree with this conclusion. We are not unmindful of the common law rule that in an action at law trover will not lie against an administrator in his representative capacity for the conversion of a legacy, or for the wrongful disposition of a stranger's property as a part of the decedent's estate, but lies against him in person. This rule, however, necessarily involves conduct on the part of the administrator in violation of his duty as such and is not applicable here. It is merely the recognition of the general principle of common law that a tort committed by an administrator is his individual act, rendering him, and not the estate, liable. No ele-

ment of tort is presented here; the administrators were acting in the best of faith in the performance of their duties, as such, not only in their opinions, but in that of the judge appointing them. These facts were all known to the plaintiff, their actions, as well as hers, to some extent were controlled by the suggestion of the County Judge under a kind of mutual understanding whereby she voluntarily delivered the stock to the administrators as such, with the knowledge that it would be listed as a part of the assets of the estate, but with the further understanding as coming from the judge that her rights would be adjusted. It was understood that the estate was to receive the benefit should it be determined they belonged to it. Under such circumstances we are of opinion that the judgment should have been against them in their official capacity, and not as individuals. The trend of authority in this country seems to thus hold.

*In Simpson v. Snyder*, 54 Iowa, 557, 6 N. W. 730, the defendant, as administrator, took possession of and sold, as assets of his intestate, property owned by the plaintiff; held, that a judgment for the value of the property was properly rendered against him in his capacity as administrator. At page 558, the court says:

"The pleadings show that the property was taken and claimed by defendant as administrator, and that he sold the same as administrator. Defendant sets up no claim to the property in any other capacity. It appears, then, that the controversy is about property which the administrator claims belongs to the estate, and which he sold as administrator. He was chargeable, as administrator, with the proceeds of the property, and it is very plain that the estate, and not the defendant, should pay plaintiff the amount recovered in this action."

To the same effect in principle is *Von Schmidt v. Bourn,* 50 Calif. 616.

In *White v. McFarland*, 148 Mo. App. 338, 128 S. W. 23, the administrator inventoried, in good faith, as assets of the estate, personal property which he refused to turn over to a claimant, believing that the property was in asset of the estate; held, that replevin would lie against him in his representative capacity, but not against him in his individual capacity, since judgment in replevin must be either for the return of the property or for its value, at the plaintiff's election. See also Vol. 18 Cyc. p. 296, 297.

It does not follow that the action should be dismissed, although instituted against Jones and Grimes personally, they intervened as administrators as did the administrator who succeeded them. Pattison and Finlayson, as heirs, etc., were also allowed to intervene and prayed that they be decreed the owners of this stock, etc. In their intervention pleadings they set forth that Pattison was a sister, and sole heir at law of Hall, etc.; that Finlayson by virtue of a decree of the District Court of El Paso county, in a suit between her and Pattison et al., was decreed to be the owner of one-half of the real estate; that they jointly were the owners, and entitled to the possession and enjoyment of the stock in suit, etc. They prayed for judgment decreeing ownership in them, etc. The plaintiff filed answers and cross complaints to the petitions of the intervenors, in which she alleged that the intervenors Pattison and Finlayson entered into a written agreement pertaining to the disposition of the assets of said estate, and a settlement of all contentions pertaining thereto, which agreement was in part for plaintiff's benefit, wherein it was provided.

"3. Out of the personal estate of the said Harry Hall the stocks and shares inventoried as belonging to Minnie Barndollar shall be considered to be her property, and the certificates relating thereto shall be delivered to her."

It was then alleged that the shares and stock mentioned in this paragraph of the contract are those in suit; that if the plaintiff is not entitled to them by virtue of matters alleged in her original complaint, she became the owner and entitled to them by virtue of this agreement between Pattison and Finlayson, and prayed judgment accordingly and for general relief, etc. Issues were joined on this question.

The court held that this paragraph was not capable of specific enforcement because too ambiguous and uncertain. In this the court erred. The record discloses, that Mrs. Pattison was a sister and sole heir at law of the deceased; that Mrs. Finlayson was a sister of his wife, who died in 1896; that after his death she instituted a suit against Mrs. Pattison and others, wherein she set forth that Hall had acquired title to various parcels of real estate, the consideration therefor being furnished by his wife, under an agreement that he should only have a life interest therein, and by deed or will he would convey this property to the brother and sister of his wife, etc.; that the brother had since died, and that Mrs. Finlayson was the sole heir at law of his wife, etc. The prayer was that the property be considered as held in trust for this purpose and title be passed accordingly. A stipulation for a decree was filed in that suit which disclosed, that an agreement had been entered into between Mrs. Finlayson and Mrs. Pattison providing for a settlement and disposition after payment of expenses of all the assets of the estate between them, share and share alike, with the exception of the stock in suit. The paragraph above set forth was a part of this agreement and if susceptible of the construction claimed, the agreement then made disposition of the entire assets of the estate. A copy of the agreement was embodied in the stipulation, which provided for a decree of ownership of

the real estate to be made and entered in that suit. The decree did not purport to determine the ownership of the personal property that was covered in the agreement only. This agreement was entered into after Mrs. Pattison and Mrs. Finlayson had been advised of the exact status of matters. Mrs. Finlayson had instituted her suit against Mrs. Pattison. Mr. Grimes, as one of the administrators had made a trip to England for the purpose of conferring with Mrs. Pattison. They were both represented by counsel, and it is reasonable to assume that their counsel knew of the details pertaining to Miss Barndollar's claim, and the substance of her evidence to support it. The inventory on file disclosed that the stock had been listed with the statement thereon that it had been found and taken from the possession of Minnie Barndollar; that it was claimed by her, and that the delivery was made under protest, waiving no right by reason thereof. Under such circumstances we cannot agree that there was any uncertainty as to the stock intended, or what was to be done with it. The fact that the agreement states, that the stock was inventoried as belonging to Minnie Barndollar, instead of saying it was inventoried as being claimed by her, in our opinion, is entitled to no weight whatever. There were no other stocks in dispute, hence, no other stocks could have been intended. To be inventoried in the matter of the estate it had to be as a part of its assets, yet in a sense it was inventoried as belonging to Miss Barndollar. It was claimed by her and was taken with the understanding that her claim as owner would be adjusted. If the language is to be followed, it is inevitable that she must be recognized as the owner and that it should be delivered to her.

The contention that the paragraph is meaningless, is not in harmony with the rules of construction to the effect that no part of a contract is to be rejected if capa-

ble of any rational meaning. It will be observed the court did not hold that Miss Barndollar could not sue on this agreement, but that it was too ambiguous and uncertain to admit of specific enforcement.

Counsel make the further contention that the agreement is not of that class where a promise is made to one person for the benefit of another, where the latter may bring suit for its performance. They contend that the clause for Miss Barndollar's benefit is not supported by any consideration, also that there is no promisor or promisee, and they ask, who promised, and who was promised, that Miss Barndollar should have the stock. They contend that there was no promise on the part of either of the parties to the agreement; that this paragraph is simply a recital. We cannot agree with this line of reasoning. The contract must be considered as a whole, and when thus done the intention of the parties is clear. The object was to settle all contentions pertaining to the entire estate, that was to the interest of both parties to the agreement, and while it is true in a sense that the promise of each was to the other, the promise of each was not only for the benefit of the other but was also for the benefit of Miss Barndollar. Prior to this settlement Mrs. Finlayson claimed the real estate; she had instituted a suit to have it declared hers. Mrs. Pattison claimed the entire estate; she was made a defendant in the Finlayson suit. Miss Barndollar claimed the mining stock. The consideration for the Pattison promise to Finlayson was Mrs. Pattison's relinquishment of a part of her claim to the entire estate, the consideration for the Finlayson promise to Mrs. Pattison was Mrs. Finlayson's relinquishment of her claim to a certain interest in the real estate, for one of these considerations Mrs. Pattison promised Mrs. Finlayson that the stock should be considered to be the property of Miss Barn-

dollar, and be delivered to her; for the other Mrs. Finlayson agreed likewise with Mrs. Pattison. Both were based upon valuable considerations from each to the other, and they both likewise got rid of the claim of Miss Barndollar; and if carried out as intended, it would have resulted in the settlement of all claims against the estate, and its disposition accordingly. It might also be observed, although immaterial to this contention, that Mrs. Finlayson's suit against Mrs. Pattison is based upon a somewhat similar agreement, namely, that of her sister with Mr. Hall for her benefit, and that Mrs. Pattison has recognized the validity of that agreement to the extent of entering into this one, which gives to Mrs. Finlayson under such claim one-half of the balance of this estate. Under the circumstances of this case the considerations were sufficient to support the validity of this paragraph in the Pattison-Finlayson agreement.

In *Green v. Morrison*, 5 Colo. 18, this court held, "A third party, for whose benefit a simple contract has been entered into for a valuable consideration, moving from the promisee, may maintain an action in his own name."

This case is cited with approval in *Moore v. First National Bank*, 38 Colo. 336, 88 Pac. 385, 10 L. R. A. (N. S.) 1001, 120 Am. St. 120, 12 Ann. Cas. 268.

In Vol. 1 Parsons Cont., 7 Ed., page 497 it is said:

"In this country the right of a third party to bring an action on a promise made to another for his benefit, seems to be somewhat more positively asserted; and we think it would be safe to consider this a prevailing rule with us; indeed it has been held that such promise is to be deemed made to the third party if adopted by him, though he was not cognizant of it when made."

In *Hendrick v. Lindsay*, 93 U. S. 145, (23 L. Ed. 855) the court at page 148 quotes with approval from *Pillman v. Van Mierop*, 3 Burr, 1663, as follows:

"Any damage or suspension of a right, or possibility of a loss occasioned to the plaintiff by the promise of another, is a sufficient consideration for such promise, and will make it binding, although no actual benefit accrues to the party promising."

Other cases in point are:—*Lehow v. Simonton,* 3 Colo. 346; *Miliani v. Tognini,* 19 Nev. 133, 7 Pac. 279; *Painter v. Kaiser,* 27 Nev., 76 Pac. 747, 65 L. R. A. 672, 103 Am. St. Rep. 772, 1 Ann. Cas. 765; *Sacramento Lumber Co. v. Wagner,* 67 Cal. 293, 7 Pac. 705; *Ferris v. American Brewing Co.,* 155 Ind. 539, 58 N. E. 701, 52 L. R. A. 305; *Hansdel v. Moore,* 153 Ind. 393, 53 N. E. 767, 53 L. R. A. 753; *Zimmerman v. Zehendner,* 164 Ind. 466, 73 N. E. 920, 3 Ann. Cas. 655; *Tweeddale v. Tweeddale,* 116 Wis. 517, 93 N. W. 440, 61 L. R. A. 509, 96 Am. St. Rep. 1003; *Hare v. Murphy,* 45 Neb. 809, 64 N. W. 211, 29 L. R. A. 851.

It is urged that plaintiff's cross complaint constitutes a departure from the original cause of action, and transfers it from an action in trover, to an equitable one, for specific performance; that it eliminates the original action at law by substituting an issue in equity conflicting with and differing radically from it, etc. As heretofore stated, the basis of the entire contention is, who was the owner of this stock. All parties who appear to be or who might be interested in any phase of any contention which might arise over it have voluntarily become parties to this action. Under such circumstances it would not only be a sacrifice of substance to form to say that every phase of this contention ought not, in this action, to be determined between the parties to it who are now in court, but to hold otherwise would be a long step backward in our modern system of procedure, without any reason therefor, other than possibly some cases cited as precedent, which adhere strictly to technical rules of

procedure; but regardless of this we are not convinced that otherwise the plaintiff was not entitled to the relief prayed for against the intervenors. The distinction between actions at law and suits in equity and the distinct forms of actions and suits have been abolished in this jurisdiction. Section 23, Revised Code, 1908, provides that a party to the action against whom anything is demanded shall answer the petition in intervention, as if it were an original complaint in the action. The intervenors here made demands against the plaintiff that they be adjudged the owners of the stock. By her answer and cross complaint against them, the plaintiff claimed title thereto, and asked for its recovery, etc.; in such case there is authority which holds that whether the proof to sustain the claim is the evidence of ownership by virtue of the gift or under the contract, is immaterial.—*McNally v. McAndrew,* 98 Wis. 62, 73 N. W. 315.

But regardless of this, upon account of their voluntary intervention, and the injecting into the suit of their claim of ownership of the property, she was entitled by cross complaint to have that issue settled in this action. The Code says that the party against whom anything is demanded by the intervenor shall answer as if it were an original complaint. Had a suit been instituted against Miss Barndollar by the intervenors to secure these stocks, it would not be contended that she could not, by cross complaint, be decreed to be its owner and have judgment accordingly, etc. Being entitled to answer here the same as though it were an original complaint against her, there is no reason why she is not entitled to the same relief.

In a way this phase of the contention was in equity. One of the intervenors, Mrs. Pattison, was a resident of England; another, Mrs. Finlayson, of Georgia; they were before the court in this action, and in our opinion the

great weight of authority is to the effect that the court had jurisdiction and should, as it did, make its findings and render judgment upon all controversies between the parties concerning the property in dispute.—*Scammon v. Kimball,* 92 U. S. 362, 23 L. Ed. 483; *Crim v. Handley,* 94 U. S. 652, 24 L. Ed. 216; *Embrey v. Palmer,* 107 U. S. 3, 2 Sup. Ct. 25, 27 L. Ed. 346; *Knox Co. v. Harshmann,* 133 U. S. 152, 10 Sup. Ct. 257, 33 L. Ed. 586; *Marshall v. Holmes,* 141 U. S. 589, 12 Sup. Ct. 62, 35 L. Ed. 870; *Rolling Mill Co. v. Ore & Steel Co.,* 152 U. S. 596, 14 Sup. Ct. 710, 38 L. Ed. 565; *Plattner Implement Co. v. Bradley & Co.,* 40 Colo. 95, 90 Pac. 86; *Ewing-Merkel Electric Co. v. Lewisville Co.,* 92 Ark. 594, 124 S. W. 509, 30 L. R. A. (N. S.) 21, 19 Ann. Cas. 1041; *Porter v. Roseman,* 165 Ind. 255, 74 N. E. 1105, 112 Am. St. Rep. 222, 6 Ann. Cas. 718; *Quick v. Lemon,* 105 Ill. 578; *Van Bibber v. Fields,* 25 Or. 527, 36 Pac. 526; *Conklin v. Botsford,* 36 Conn. 105; *Mayes v. Stephens,* 38 Or. 512, 63 Pac. 730, 64 Pac. 319; *Zorn v. Livesley,* 44 Or. 501, 75 Pac. 1057.

We are not impressed with the contention that because the plaintiff instituted another action, wherein upon other grounds she made claims to the entire estate of Mr. Hall, (which suit was thereafter dismissed) that her position therein was inconsistent with her claim here, to the extent that it would estop her from prosecuting this suit. No authorities have been cited which hold that the owner of property may lose title thereto by making claim to other property along with it. Had the wife of the deceased made claim to his entire estate as sole heir at law in a suit wherein it developed that he had children living by a former wife, this would not estop her from making the contention that the husband, during his lifetime had made her a gift *inter vivos* of certain personal property found in her possession after his demise, and for that reason that it was not a part of his estate. The same principle is applicable here.

The judgment will be reversed and the cause remanded with instructions to dismiss the action against Grimes and Jones personally, and to enter judgment against the intervenors in favor of Miss Barndollar, decreeing that she was the owner of the stocks described in her original complaint, endorsed and unendorsed, and was entitled to its possession at the date of the execution of the contract above mentioned, and where disclosed by this record or may hereafter be shown that any of the stock has been disposed of by the intervenors or any of them, that she have money judgment for such conversion, and that her damages for the detention of that undisposed of, if any, to be delivered to her, as well as for that sold, be upon the basis that she was the owner and entitled to its possession as of the date last mentioned. The costs in both courts accruing after the intervenors became parties to the action will be taxed against them. Those incurred prior thereto should be paid by the defendant in error.

. <i>Reversed.</i>

Decision <i>en banc.</i>

<i>On Petition for Rehearing.</i>

Counsel for plaintiffs in error urge that in any event our opinion should be modified to the extent that the judgment to be entered should be confined to the intervenors, Pattison and Findlayson; and for the stocks disposed of, it should only be for their value at the date of the execution of the Pattison-Finlayson agreement. We cannot agree with either of these positions. The intervention of the administrators as such was in order that they might resist the claim of the defendant in error to these stocks and the value thereof, and was allowed at their request. They alleged that they had theretofore

secured possession of the stocks and had charged them-selves with the receipt of them as assets of the estate, and were proper parties to defend against the claim of the defendant in error to the stocks, or their value, as representing the interest of those who should become entitled to it, etc. The record discloses that the administrators had the stocks in their possession as administrators, and that they had disposed of a part of them and applied the proceeds to the use and benefit of the estate. What has been done in this respect since the rendition of the judgment by the trial court, is not disclosed. In the circumstances of this case and in order that it may be a final determination of this contention between the parties, we think it proper that the judgment should run against all the intervenors. This includes the administrators in their official capacity as such.

Referring to the second contention, we adhere to our former opinion for the reasons therein stated. The defendant in error became the owner of the stocks under the Pattison-Finlayson agreement (if she was not before its execution), and for this reason was entitled to their possession at the date of the execution of this contract, but we cannot agree that her damages should be limited to their value as of that date. A demand therefor appears to have been made upon the administrators about December 7, 1910. This demand was refused. There is no evidence that all of these stocks were disposed of before this date or have ever been. The Pattison-Finlayson agreement bears date April the 12th, 1909. In the *Continental Divide M. I. Co. v. Bliley*, 23 Colo. 160, 46 Pac. 633, this court, in substance, said that while different rules appear to prevail in England and in some American states as to the correct measure of damages in such cases, the tendency of modern decisions supported by the weight of authority sustains the rule that

its market value upon the day of the conversion, to-wit, the time when the owner, being entitled to immediate possession of the stock, demands the same and is refused; and while it was there said that perhaps exceptions to the rule should be allowed in some cases, this was the rule adopted in that case, and we think is the rule that should be adopted here with the exceptions that the defendant in error should be entitled to an additional amount equal to any dividends paid upon any of this converted stock between the date of the Pattison-Finlayson contract and the date of her demand therefor with interest upon the entire amount from the date of the demand.

The record does not show that all of the stocks have been disposed of, but there is nothing before us to show that they have not all been disposed of since the trial. The directions in the original opinion were upon the theory that a part of them could and would be returned, and while there would probably be no difference in the ultimate result, yet in the Bliley case, *supra*, this court treats stocks as being converted, when the owner, being entitled to its immediate possession, demands the same and is refused. This seems to be the general rule and after further consideration we are of opinion it should be followed here and this case disposed of upon the theory that all of those stocks were converted at the time of the demand for them and the refusal to comply therewith. The directions in the original opinion will be modified accordingly.

The petition for rehearing is denied.

Decided December 7, A. D. 1914. Rehearing denied February 1, A. D. 1915.

*On Motion to Recall Remittitur and Correct Mandate.*

*Per Curiam.*

After the remittitur was issued it was made to appear that the mandate directing judgment against the administrators in their official capacity was not justified by the facts disclosed by the record. Thereupon, at the request of counsel representing all parties, the remittitur was recalled. It appears that Thomas, as administrator *de bonis non,* petitioned the trial court to be substituted in place of Grimes and Jones as defendants in their individual capacity, and as administrators of the estate. On this petition an order was entered substituting Thomas, in his representative capacity, in place of Grimes and Jones, as administrators, but denied as to them individually. It thus appears that subsequent to this order. Grimes and Jones were not before the trial court in their representative capacity, and hence, not here as such, and it was a mistake to direct a judgment against ''the administrators in their official capacity,'' when in fact there was but one, namely, Thomas. It is therefore ordered that the mandate of this court be corrected so it will direct that judgment be entered against all the intervenors, in accordance with the views expressed in the opinion, which includes the administrator, Thomas. Let remittitur issue accordingly.

*Mandate corrected.*

Mr. JUSTICE SCOTT dissents.

Mr. JUSTICE TELLER not participating.

SCOTT, J., dissenting.

I do not doubt the power of the court to recall its remittitur, at least within the term at which the judgment was rendered, in case where an order or judgment

was improperly granted upon a mistake of fact, or erroneous suggestion, and to make any change or correction even to the rendition of an entirely different judgment. This court upon its own motion exercised that power in the case of *Chenoweth v. State Board of Medical Examiners,* 57 Colo. 73, 73, 141, Pac. 132, 51 L. R. A. (N. S.) 958.

I agree that the judgment in this case should be in favor of Barndollar, and this because of the agreement between Pattison and Finlayson, but I cannot agree that the measure of damage allowed can be sustained upon any theory, and for such reason the judgment should be corrected in that respect.

Conceding title to the stocks to be in Barndollar, still there was no wrongful conversion upon the part of any person, either personally or in a representative capacity. Even so, there can be no recovery in such a case without demand first having been made.

In my view of the law, there was no demand in this case. But if we concede a demand to have been made, then such demand was upon Jones and Grimes personally, and not as administrators.

The suit was instituted against them personally, a demand was upon them personally alleged, and in the answer to each petition in intervention is to be found the repeated denial that Jones and Grimes acted in their capacity as administrators, and also repeated allegations that they acted in their individual capacity.

A demand upon one as an individual is not a demand upon him as an administrator, and particularly when the party making the demand expressly declares the demand to be upon the individual and not the official.

For such reason the arbitrary date fixed in the judgment as the date of the demand is without basis, either in law or fact. There can be no recovery for conversion when the essential elements of conversion are wanting.

The defendants plead and prove a tender to the plaintiff of a large part at least, of the stocks involved, on May 1, 1910. This tender appears to have been unconditional and was refused. Certainly these stocks at least should be excepted from the judgment, in so far as it may relate to depreciation in value after that date.