EMPLOYERS' FIRE INSURANCE COMPANY, Plaintiff–Appellee,

v.

WESTERN GUARANTY FUND SERVICES, Defendant–Appellant.

No. 94CA1482.

Colorado Court of Appeals, Div. I.

Feb. 8, 1996.

Rehearing Denied May 2, 1996.

Certiorari Denied Oct. 15, 1996.

Mark Sisun & Associates, P.C., Steven P. Hemmerle, Denver, for Plaintiff–Appellee.

Rodman & Ross–Shannon, David L. Murphy, Denver, for Defendant–Appellant.

Opinion by Judge CRISWELL.

The defendant, Western Guaranty Fund Services (Western), appeals from a summary judgment which declared that a general liability policy issued by plaintiff, Employers' Fire Insurance Company (Employers), provided no coverage for claims asserted against certain of the other defendants (the Digbys), who were insureds under both the Employers' primary policy and under an excess liability policy issued by a carrier whose rights and liabilities have been assumed by Western. Simultaneously with the entry of such decree, the trial court also denied Western's motion to assert a counterclaim against Employers. We agree with the trial court that Employers' policy did not provide any coverage for the claims asserted against the Digbys. Therefore, we affirm.

Employers' policy was in effect from October 1, 1980, to October 1, 1983. Under its terms, Employers agreed to:

pay on behalf of [the Digbys] all sums which [they] shall become legally obligated to pay as damages because of ... *property damage* caused by an *occurrence* ... and [Employers] shall have the right and duty to defend any suit against [the Digbys] seeking damages on account of such ... *property damage* .... (emphasis supplied)

Pertinent to the issues presented here are three other provisions of this policy.

First, "property damage" is defined to include:

*loss of use* of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an *occurrence during the policy period;* (emphasis supplied)

Second, "occurrence" is defined as:

an accident ... which results in property damage neither expected nor intended from the stand point of [the Digbys]....

The term, "accident," is not defined by the policy.

Finally, the policy provides that, except under specified types of agreements, none of which are involved here, it does not apply to any "liability assumed by the [Digbys] under any contract or agreement."

In August 1980, more than a month before Employers' policy became effective, certain of the other defendants (the Yeagers) filed suit against the Digbys in the United States District Court for the District of Mississippi. The claims asserted in their complaint had their genesis in a 1978 transaction between the Digbys and the Yeagers. At that time, the two parties, both of whom were the owners and operators of interstate trucking companies, entered into a written lease and purchase agreement, which was subject to the approval of the Interstate Commerce Commission (I.C.C.), pursuant to which the Digbys sought to acquire certain certificates of public necessity and convenience issued to the Yeagers by the I.C.C., as well as the business equipment used by the Yeagers under those certificates.

Pending I.C.C. approval, the Digbys took possession of the Yeagers' certificates and all of the described equipment, pursuant to temporary authority granted by the I.C.C. In addition, the parties entered into a separate agreement whereby the Yeagers agreed to consult with, and not to compete with, the Digbys, and the Digbys agreed to make certain monetary payments to the Yeagers.

The Yeagers' Mississippi complaint alleged that, prior to July 1, 1980, the I.C.C. had approved the transaction, but had placed conditions upon it that were unacceptable to the Digbys. As a result, the Digbys exercised their right under the purchase and lease agreement to rescind that agreement.

The Yeagers alleged that the Digbys had violated the terms of both the purchase and lease agreement and the consulting and non-competition agreement in several respects. Western acknowledges that many of the claims asserted by the Yeagers (such as their claim that the Digbys had failed to make proper payments under the consulting agreement) did not describe risks covered by Employers' policy. It asserts, however, that their complaint could reasonably be interpreted to allege a "property damage" claim within that policy's coverage.

In this respect, the Yeagers alleged that, after the purchase and lease agreement was terminated, the Digbys had "intentionally and willfully refused to return the leased equipment and the authority [I.C.C. certificates]" to the Yeagers. They also asserted that the Digbys had "converted the equipment and authority to [their] own use by continuing to transport commodities under [the Yeagers'] ICC authority." It was alleged that the Digbys were still "willfully and maliciously" refusing to return the Yeagers' property to them.

In addition, the Yeagers' complaint also alleged that the purchase and lease agreement required the Digbys to make the payments called for by certain liens encumbering some of the equipment delivered to them. However, it was asserted that, because the Digbys did not want to acquire some of the Yeagers' equipment, but did so only to "strike a bargain," the Digbys "fail[ed] to make payments on some equipment to cause foreclosure and/or repossession of equipment that [the Digbys] never wanted to initially lease." It was alleged that this occurred in October 1978, some two years before Employers' policy became effective.

There is no evidence that Employers was given any notice of this litigation until August 1985, some four years after it was started and shortly after the Yeagers filed an amended complaint, the pertinent allegations of which are summarized above. At that time, the Digbys requested that a defense be provided to them under the policy and, in doing so, described the Yeagers' complaint as one which alleged that the Digbys had:

converted motor vehicle equipment ... failed to make payments under a Consulting and Non–Compete Agreement ... and conspired to deprive [the Yeagers] of their business including their equipment.

In addition, in 1986 Employers was informed that discovery in the Mississippi action had revealed that the Digbys had allegedly sold some of the equipment to third parties in 1982.

Ultimately, on appeal to the United States Court of Appeals for the Fifth Circuit, the Mississippi litigation was dismissed for lack of personal jurisdiction over the Digbys. And, in May 1990, two actions were commenced by the Yeagers in the Arkansas federal district court.

The complaint in the Arkansas litigation that is the subject of this action repeats, substantially verbatim, the Yeagers' former allegations. Thus, it is alleged that the Digbys had failed to make lien payments so that foreclosure upon certain pieces of equipment would occur; that they had "intentionally and willfully" refused to return the Yeagers' equipment, so that they could "wanton[ly] and malicious[ly]" exploit the Yeagers' business; and that the Digbys "participated in schemes to acquire title to property leased" from the Yeagers.

Shortly after the commencement of the litigation in Arkansas, Employers filed its complaint in the instant action, seeking a declaration that the claims asserted by the Yeagers were not among the risks covered by its policy. At about the same time, it sent a letter to the Digbys and Western that outlined some seven reasons why it asserted that it had no duty to defend the Digbys. It then notified them of the commencement of this action, but said that Employers would "participate in the defense" of the Digbys in the Arkansas litigation, pending resolution of the question. Finally, however, Employers' letter specifically "reserve[d] any and all rights it has or may have under any policy" insuring the Digbys.

While this action has been pending, the Arkansas litigation was concluded by the entry of a final judgment dismissing all of the Yeagers' claims, except for the claim based upon the Digbys' failure to make the payments called for by the consulting and non-competition agreement. The Digbys were then dismissed from this action, and none of their rights are implicated by Western's appeal.

Thereafter, Western and Employers each sought the entry of summary judgment in its favor. Western also sought to add a counterclaim to its responsive pleading to allege that Employers' letter agreeing to participate in the Digbys' defense constituted a separate contract requiring it to do so, which it breached by failing to share in the defense costs expended by Western.

Employers' motion for summary judgment was grounded upon several alternative legal assertions, and in granting its motion, the trial court expressly adopted each of them. In addition, it summarily denied Western's motion to amend its pleadings. It is from the resulting judgment that Western has taken its appeal.

## I.

While the trial court relied upon several grounds for reaching the conclusion that the Employers' policy did not apply to the claims asserted by the Yeagers, before us both parties have argued that the question whether the Yeagers' pleadings described any "occurrence" during the effective term of that policy is the central one. We agree, and because we conclude that no such "occurrence" can reasonably be said to have been described, we affirm the trial court's determination that the policy imposed no duty upon Employers to defend the Digbys against the Yeagers' allegations.

The principles adopted by our supreme court in *Hecla Mining Co. v. New Hampshire Insurance Co.*, 811 P.2d 1083 (Colo.1991) provide the standards by which Employers' alleged duty to defend must be tested. There, the court determined that there is a significant difference between a liability carrier's duty to defend against a claim and its duty to indemnify the insured in the event of an adverse judgment. While the duty to indemnify can only be determined after the development of a full factual record, the duty to defend must be determined based solely on a comparison of the allegations of the complaint made against the insured with the insuring provisions of the policy.

If "the underlying complaint against the insure[d] alleges any facts that might fall within the coverage of the policy," the carrier is under an initial duty to defend, although the later trial may result in factual determinations that make it clear that the policy provides no coverage. *Hecla Mining Co. v. New Hampshire Insurance Co., supra,* 811 P.2d at 1089. In establishing this comparison of written documents as the proper method of determining whether a duty to defend exists, the *Hecla* majority rejected the dissent's contrary thesis that it is permissible to consider evidence *aliunde.*

■ Here, then, we agree that the Yeagers' allegations that the Digbys deprived them of their equipment and I.C.C. certificates, either through direct conversion or as a result of manipulative foreclosures, generally alleged instances of "property damage" under the special definition of that term in the policy. Such allegations asserted a "loss of use of tangible property" without physical damage. The issue, however, is whether those allegations assert that such property damage resulted from an "occurrence during the policy period."

On its face, the complaint asserts that the Digbys undertook the actions described on or before July 1, 1980, when they rescinded the purchase and lease agreement. Indeed, all of the allegations relied upon to establish a duty to defend were contained within the Mississippi court complaint, which was filed several weeks *before* the Employers' policy was issued.

Western argues, however, that the Yeagers' complaint can reasonably be interpreted as alleging that the Digbys improperly *continued* to exercise dominion and control over the Yeagers' property into the policy period. We accept that characterization of the Yeagers' complaint. This does not mean, however, that "property damage" occurred during the policy period.

■ A conversion of personal property occurs, at the latest, when a demand for its return is refused. *Grimes v. Barndollar,* 58 Colo. 421, 148 P. 256 (1914). It is not a continuing tort; damages for a conversion are based upon the property's fair market value at the time and place of the conversion, plus interest thereon. *Masterson v. McCroskie,* 194 Colo. 460, 573 P.2d 547 (1978).

■ Here, then, the "damage," *i.e.,* the "loss of use," occurred when the Digbys allegedly failed to return the Yeagers' property to them when the agreement was rescinded on July 1, 1980, a date prior to the effective term of the Employers' policy.

■ However, even if it could be said that a conversion is a "continuing" tort, still we are convinced that the Yeagers' complaint did not allege an "occurrence" within the meaning of the policy. The allegations did not describe any "accident" resulting in damage "neither expected nor intended" by the Digbys.

The *Hecla* opinion is also instructive upon this issue. There, under a similar policy provision, the supreme court, relying on *City of Johnstown v. Bankers Standard Insurance Co.,* 877 F.2d 1146 (2d Cir.1989), held that the quoted phrase excluded only:

> those damages that the insured knew would flow directly and immediately from its intentional act.

*Hecla Mining Co. v. New Hampshire Insurance Co., supra,* 811 P.2d at 1088.

Here, however, the Yeagers' complaint alleged that the Digbys acted intentionally, willfully, and wantonly in refusing to return the Yeagers' property to them. Accepting these allegations as true, there can be no question that the Digbys knew that such failure would result in the Yeagers' loss of use of that property.

For similar reasons, courts have generally concluded that an allegation of an intentional conversion of property does not constitute an "occurrence" under policy provisions similar to the one here. *See Red Ball Leasing, Inc. v. Hartford Accident & Indemnity Co.,* 915 F.2d 306 (7th Cir.1990) (applying Indiana law); *Collin v. American Empire Insurance Co.,* 21 Cal.App.4th 787, 26 Cal.Rptr.2d 391 (1994); *Reisig v. Union Insurance Co.,* 870 P.2d 1066 (Wyo.1994).

■ Finally, Western asserts that, because the Yeagers claimed that the Digbys had caused physical damage to their equip-

ment, such damage might reasonably have been the result of the Digbys' negligence and, therefore, covered by the Employers' policy. We disagree.

First, none of the complaints to which reference has been made describes any such claim. The only possible description of such a claim is allegedly contained in the pre-trial order entered by the Mississippi court. Only very selective portions (three pages) of that order were placed in this record, however. And, in describing the Yeagers' various claims, that order makes no reference to any claim based upon physical damage. In summarizing the issues to be tried, however, one issue is stated as:

> Whether or not the [Digbys] ... exercised dominion or control over or *otherwise damaged* or disposed of [the Yeagers'] equipment inconsistent with and contrary to [the Yeagers'] rights. (emphasis supplied)

However, given the allegations with respect to the Digbys' intentional actions, both in withholding property from the Yeagers and in causing that property to be foreclosed upon, we cannot conclude that the term "otherwise damaged," as used here, can be taken to refer to some type of physical damage to property that was later returned to the Yeagers. Such a claim is nowhere to be found within the various pleadings.

Indeed, when the Yeagers later filed their complaint with the Arkansas court, no hint was given as to any claim based on physical damage or negligence, and Western has failed to point to any later pleading that could have put Employers on notice that such a claim was being asserted.

We conclude, therefore, that, even if either of the Yeagers' complaints could be viewed as having alleged some post-October 1980 acts by the Digbys, none of those allegations referred to any "occurrence" within the meaning of the policy.

## II.

We also reject Western's argument that the court erred in refusing to allow it to add a counterclaim based on Employers' letter.

We have already concluded that, applying the standards of *Hecla*, Employers' policy provided no coverage for the claims asserted against the Digbys. The question presented by Western's proffered pleading, then, is whether Employers' letter provided a basis for asserting that it had a duty to defend the Digbys independent of that policy. We conclude that it does not.

██ The *Hecla* court made clear that, if a liability carrier is faced with a court complaint against its insured, the allegations of which could implicate a risk covered by its policy, the appropriate course of action is for the carrier to enter upon a defense of the insured "under a reservation of rights *to seek reimbursement* should the facts at [the underlying trial] prove that the incident ... was not covered by the policy...." *Hecla Mining Co. v. New Hampshire Insurance Co., supra,* 811 P.2d at 1089 (emphasis supplied). This conclusion was based, in large part, upon the disadvantage to which an insured would be placed were it required to defend a declaratory judgment action during the pendency of the underlying litigation. *See Connecticut General Life Insurance Co. v. A.A.A. Waterproofing, Inc.,* 911 P.2d 684 (Colo.App.1995); *New Hampshire Insurance Co. v. Constitution Associates,* 908 P.2d 1163 (Colo.App.1995) (*cert. granted* ).

██ Western asserts that Employers agreed to participate in the Digbys' defense and that it later agreed to use common counsel with Western for such defense, so that its agreement was, in effect, one to share defense costs with Western. It also asserts that the reservation of rights set forth in Employers' letter was insufficient under *Hecla* to allow Employers later to contest the existence of any duty on its behalf to engage in such defense. Under the circumstances presented here, we disagree.

Here, at the time of Employers' letter, the Digbys were not undefended. On the contrary, their excess liability carrier had been defending them for a period of some five years. Employers' refusal to defend, under these circumstances, caused the Digbys no harm; it raised only the issue whether the excess carrier was to bear the full financial burden of the defense or whether the litiga-

tion expenses were to be shared by Employers.

Further, Employers' letter was specific in reserving "*any and all* rights" which it might have under the pertinent policy. Although Western asserts that such language is insufficient under *Hecla* to reserve the right "to seek reimbursement," we conclude that it was sufficient to allow Employers to resist the claim asserted by Western. Indeed, Employers' letter makes clear that its agreement to participate in the defense should not be interpreted as a waiver of its right to contest its duty to defend under the policy.

Whether such language would be sufficient, under *Hecla,* to put an insured on notice of a possible future claim for reimbursement of defense costs, we need not decide. We do determine, however, that Employers' letter did not furnish a basis for any separate or independent liability, beyond the liability it assumed under its policy, and that its letter was sufficient to reserve its right to contest Western's claim for payment of defense costs.

Hence, because we conclude that Employers had no duty to enter upon a defense of the Digbys under its policy, the counterclaim proffered by Western did not, as a matter of law, state any proper claim against Employers. The trial court, therefore, committed no prejudicial error in refusing to allow it to be asserted.

The judgment of the trial court is affirmed.

METZGER and ROTHENBERG, JJ., concur.